Daniel F. Poulson
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: daniel_poulson@fd.org

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESUS AYALACORIA,<br><br>Defendant. | Case No. 3:10-cr-00086-TMB<br><br>**AMENDED MOTION AND MEMORANDUM IN SUPPORT OF COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)** |

COMES NOW the Federal Defenders on behalf of Jesus Alberto Ayalacoria and hereby submits this amended motion and memorandum in support of Mr. Ayalacoria's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

As modified by the First Step Act, the compassionate release statute allows courts to reduce sentences for "extraordinary and compelling" reasons.

Mr. Ayalacoria's age (50), and his diagnoses of diabetes, hepatitis, high blood pressure and sleep apnea, place him at an elevated risk of serious injury or death if he contracts COVID-19. This is not a generalized concern. **Mr. Ayalacoria is incarcerated at McRae CI, a facility which is currently engulfed in a COVID-19 outbreak**.

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 1 of 27

**According to data provided by the BOP on May 8, 2020[1] there have been at least seven inmates who had tested positive for the coronavirus at McRae CI. There were an additional 19 staff who have tested positive.[2]** In his *pro se* motion, Mr. Ayalacoria reports that there has been at least one inmate death.

These numbers are undoubtedly an undercount, since it does not appear that widespread testing is being conducted at the facility. State prisons that have conducted comprehensive testing in response to coronavirus "clusters" have typically determined that a majority of the inmates are in fact positive for the coronavirus.[3]

Courts around the country have recognized that the risk of COVID-19 to persons held in prisons is "significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *See Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y. March 26, 2020).[4] U.S.

---

[1] The BOP document reporting infections at private facilities can be accessed here: http://bop.gov/coronavirus/docs/private_prisons_COVID_data.pdf

[2] The Marshall Project, *Why Did It Take the Feds Weeks to Report COVID-19 Cases in Privately Run Prisons?* (May 8, 2020), available at https://www.themarshallproject.org/2020/05/08/why-did-it-take-the-feds-weeks-to-report-covid-19-cases-in-privately-run-prisons (submitted as Exhibit D-5)

[3] The Marshall Project, *These Prisons are Doing Mass Testing for COVID-19 – and Finding Mass Infections* (April 24, 2020), available at https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections (reporting that at North Carolina's Neuse Correctional Institution, where prison officials tested all 700 inmates and 250 staff, they found at least 65 percent of the prisoners have the virus) (submitted as Exhibit D-6).

[4] *See* Office of the Attorney General, "Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic," (March 26, 2020), available at: https://assets.documentcloud.org/documents/6820452/Memorandum-from-Attorney-General- to-BOP-re-Home.pdf.

jails and prison are potential hothouses for infection. Inmates live in close quarters, share bathrooms and dining halls, and often have limited access to health care.

Although he is in a facility where COVID-19 infections have been confirmed, Mr. Ayalacoria is powerless to socially isolate himself from his fellow inmates or corrections staff. Because the conditions of confinement at BOP facilities – and McRae CI in particular – greatly increase his risk of exposure, Mr. Ayalacoria can establish "extraordinary and compelling" reasons justifying a reduction in sentence.

Mr. Ayalacoria has served approximately ten years on a 180-month sentence. According to the BOP, his release date is June 26, 2023, leaving slightly more than three years left to serve. In light of the coronavirus pandemic, his co-morbidities and the significant amount of time that he has already served, this Court should conclude that Mr. Ayalaocoria has served a sentence sufficient but not greater than necessary to achieve the goals of sentencing.

Mr. Ayalacoria would not present a danger to the community if he is released, given the significant time that he has already served, as well as the fact that he will be deported to Mexico if he is released from BOP custody.

The compassionate release statute requires that inmates first submit a request to the warden of their facility before seeking judicial relief. However, Mr. Ayalacoria is incarcerated at a private facility that is not managed by the Bureau of Prisons.[5] This Court

---

[5] *Supra* Fn. 1

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 3 of 27

has previously ruled that a defendant incarcerated at a non-BOP facility must contact the BOP before establishing that administrative remedies are unavailable. United States v. Hoover, 3:08-cr-00123-TMB, Doc. 321 at 2 (D. Ak. May 13, 2020).

**Counsel has contacted the BOP regional counsel for this district and has confirmed that the Bureau of Prisons does not offer administrative remedies to inmates seeking compassionate release who are housed in non-BOP facilities like McRae CI**. *See* Exhibit D-1 (email correspondence with BOP regional counsel George Cho).

The Supreme Court has recognized that exhaustion of "available" administrative remedies may be excused when those remedies are simply a "dead end." *Ross v. Blake*, 136 S.Ct. at 1859 (2016). Stated differently, when the "facts on the ground" indicate that a grievance procedure provides no possibility of relief, the procedures are in fact "unavailable." *Id.* That is the case here. Mr. Ayalacoria can establish both that administrative remedies are unavailable as well as futile.

Mr. Ayalacoria's medical records will be requested from the U.S. Attorney's office and will be filed with the court when received.

## I.    BACKGROUND

On March 22, 2011 this Court sentenced Mr. Ayalacoria to serve 180 months' incarceration in connection with his guilty plea to two counts of distribution of methamphetamine, 18 U.S.C. § 841(a)(1), (b)(1)(B) and (b)(1)(C); and one count of

possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 922(c)(1)(A)(i). Doc. 49. Mr. Ayalacoria was placed on supervised release for a period of 5 years. Id.

As described in his pro se motion, Mr. Ayalacoria has been diagnosed with asthma and diabetes. He has also been diagnosed with sleep apnea and he requires a CPAP machine.

According to the BOP web site, Mr. Ayalacoria is incarcerated at McRae CI, a private facility located in McRae Helena, Georgia.[6] The facility is managed by a private contractor, CoreCivic. As of May 8, there have been approximately seven inmates who have tested positive for the coronavirus,[7] as well as 19 staff members.[8]

## II.    STATUTORY AUTHORITY

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,

---

[6] *See* http://bop.gov/locations/ci/mca/
[7] The BOP document reporting infections at private facilities can be accessed here: http://bop.gov/coronavirus/docs/private_prisons_COVID_data.pdf
[8] The Marshall Project, *Why Did It Take the Feds Weeks to Report COVID-19 Cases in Privately Run Prisons?* (May 8, 2020), available at https://www.themarshallproject.org/2020/05/08/why-did-it-take-the-feds-weeks-to-report-covid-19-cases-in-privately-run-prisons (submitted as Exhibit D-5).

may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

> (i) extraordinary and compelling reasons warrant such a reduction; …
>
> *****

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and compelling reasons," none of which apply to Mr. Ayalacoria.

The policy statement also provides a "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Id.* § 1B1.13, cmt. n.1(D).

//

# III.    ARGUMENT

## A. The court has the authority to consider Mr. Ayalacoria's motion because officials at the BOP have stated in communications with undersigned counsel that administrative remedies are not available to inmates like Mr. Ayalacoria who are housed at private facilities.

McRae CI is one of several private detention centers under contract with the Bureau of Prisons housing federal inmates, many of whom, like Mr. Ayalacoria, are aliens subject to deportation upon release.[9] Because he is not housed in a BOP-managed facility, the BOP has disavowed any responsibility to seek compassionate release for inmates like Mr. Ayalacoria. In correspondence with counsel, George Cho, a supervisory attorney with the Consolidated Legal Center at the Department of Justice, has stated that BOP is "currently unable to evaluate *any* compassionate release requests" filed by inmates housed at state and private facilities. Exhibit D-1.

As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

---

[9] *See* https://www.bop.gov/about/facilities/contract_facilities.jsp ("Contract prisons are secure institutions operated by private corporations. The majority of BOP inmates in private prisons are sentenced criminal aliens who may be deported upon completion of their sentence.")

This exhaustion requirement makes BOP a claims processor with a 30-day right-of-first refusal, but exhaustion of administrative remedies is not necessary for a district court to exercise jurisdiction over a compassionate release motion. The Supreme Court not only recognizes the difference between claims-processing rules and jurisdictional requirements but "has emphasized the necessity of observing [that] important distinction" and "warding off profligate use of the term 'jurisdiction.'" *United States. v. Haney*, __ F. Supp. 3d __, 2020 WL 1821988, at *2 (S.D.N.Y. 2020) (citing *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010); *Sebelius v. Auburn Reg'l Med. Ctr*., 568 U.S. 145, 153 (2013)).

Luckily, there is a "bright line test": "*only* if Congress has clearly stated that the rule is jurisdictional" is the rule jurisdictional — "absent such a clear statement" restrictions are "non-jurisdictional." Id. (citing *Auburn Reg'l*, 568 U.S. at 153) (emphasis added).

Section 3582 contains no clear statement that exhaustion is a jurisdictional prerequisite.[10] Rather, the exhaustion requirement under Section 3582(c)(1)(A)(i) is better understood as a "claim-processing rule."[11] The Department of Justice has agreed with this analysis in other cases. See United States v. Gentille, 2020 WL 1814158, at *3 (S.D.N.Y.

---

[10] United States. v. Haney, __ F. Supp. 3d __, 2020 WL 1821988, at *2 (S.D.N.Y. 2020) (citing Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 161 (2010); Sebelius v. Auburn Reg'l Med. Ctr., 568 U.S. 145, 153 (2013)).
[11] Id. at *3.

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 8 of 27

Apr. 9, 2020) (government concedes exhaustion "is not jurisdictional, but rather is a claims-processing rule").

And as numerous district courts considering compassionate release applications brought by vulnerable defendants have concluded, the exhaustion rule may be excused where resort to such remedies would be futile. *See United State v. Perez*, -- F. Supp. 3d --, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (citations omitted). (excusing exhaustion for defendant's compassionate release motion based on futility and risk of prejudice). This corresponds with Supreme Court precedent recognizing that even where exhaustion of administrative remedies is mandatory, a defendant need only seek "*available*" administrative remedies. *Ross v. Blake*, 136 S.Ct. at 1859 (2016). When the "facts on the ground" indicate that an administrative process is a "dead end," such procedures are simply unavailable. *Id.*

Here, exhaustion of administrative remedies should be excused because the BOP has stated that administrative remedies are simply not available to inmates housed at private facilities under contract with the BOP. According to a BOP legal representative, the BOP is "structurally incapable of assessing any of these inmates' respective circumstances" so long as they remain in the custody of a private contract facility, and not the custody of a BOP facility. The Government conceded in other cases that defendants like Mr. Ayalacoria who are housed at non-BOP facilities do not need to exhaust administrative remedies. *See United States v. Hoover*, Case No. 3:08-cr-00123-TMB, Doc. 320 at 10 (Gov. Opp. Br.) ("Hoover is not housed in a BOP facility, however, so he has no BOP warden to whom he

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 9 of 27

could submit such a request. He has therefore 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [his] behalf' under the circumstances of his confinement.").

Because Mr. Ayalocoria has reached out to BOP officials and determined that no administrative remedies are available, the exhaustion requirement may be excused. <u>See</u> <u>United States v. Jepsen</u>, 2020 WL 1640232, at *3 (D. Conn. Apr. 1, 2020) (excusing exhaustion for defendant not placed in BOP-designated facility and no administrative remedies available); <u>United States v. Gonzalez</u>, 2020 WL 1536155, at *1 (E.D. Wash. Mar. 31, 2020) (excusing exhaustion where administrative remedies unavailable to defendant not placed in BOP-designated facility).

This Court should excuse exhaustion because the BOP will not seek compassionate release on behalf of inmates housed in private facilities, and such remedies are therefore unavailable. *See Sun v. Ashcroft*, 370 F.3d 932, 942 (9th Cir. 2004) (futile where "the agency's position on the question at issue appears already set, and it is very likely what the result of recourse to administrative remedies would be").[12]

//

---

[12] <u>See also Jasperson v. Bur. of Prisons</u>, 460 F. Supp. 2d 76, 88 (D.D.C. 2006) (court "may excuse exhaustion" where "resort to administrative remedies would be clearly useless" or there exists "adequate certainty of an adverse response") (quoting <u>Commc'ns Workers of Am. v. AT&T</u>, 40 F.3d 426, 432 (D.C. Cir. 1994), <u>Randolph-Sheppard Vendors of Am. v. Weinberger</u>, 795 F.2d 90, 105 (D.C. Cir. 1986)); <u>Knish v. Stine</u>, 347 F. Supp. 2d 682, 686 (D. Minn. 2004) (futile to exhaust BOP procedures where "the administrative body has predetermined the issue before it") (citing <u>Gibson v. Berryhill</u>, 411 U.S. 564, 575 n. 14 (1973)).

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 10 of 27

**B. This Court is empowered to determine what constitutes "extraordinary and compelling" circumstances to justify a reduction in sentence.**

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The resulting policy statement, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health combined with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C).

The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

The policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. The First Step Act, however, "significantly altered the landscape of compassionate-release motions." *United States v. Rodriguez*, 2020 WL 1627331, at *4 (E.D. Pa. Apr. 1, 2020).

Because the Commission has not updated its policy statement to account for the changes imposed by the First Step Act, the policy statement is now clearly outdated. For that reason, a majority of district courts around the country have ruled that, in the absence

of applicable policy statements, courts "can determine whether any extraordinary and compelling reasons other than those delineated in [U.S.S.G. § 1B1.13] warrant" sentence modification. *United States v. Brown*, -- F.Supp.3d --, 2019 WL 4942051, at *2 (S.D. Iowa Oct. 8, 2019).

These courts have held that the First Step Act's amendments demonstrate that the existing policy statement no longer "complie[s] with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under Section 3582." *United States v. Cantu*, -- F. Supp. 3d --, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (publication forthcoming).

Further, because Congress enabled incarcerated persons to file "direct motions to district courts" for sentence modification in part to "increase the use of compassionate release," the "only way" to give force to that command "is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" *Brown*, 411 F. Supp. 3d at 451; *Redd*, 2020 WL 1248493, at *7 (citing cases). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance."

The Government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."

*Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The *Young* court followed the majority of district courts by recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.*[13] *See also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

In this district, Judge Holland and Judge Singleton have agreed with this reasoning. *See* United States v. Valdez, Case No. 3:98-cr-0133–01-HRH, Doc. 647 at 5 (D. Alaska Nov. 6, 2019) (holding that a district court is no longer bound to look to the director of the Bureau of Prisons for a catch-all definition of extraordinary and compelling reasons justifying a reduction in sentence); United States v. Fields, Case No. 3:12-cr-00022-JKS-

---

[13] *See also United States v. O'Bryan*, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, 2020 WL 806121, at *2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law) (citing ten other cases); *Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

DMS, Doc. 223 at 9 (D. Alaska May 6, 2020) ("This Court is persuaded by the reasoning of those district courts that it is not constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction and that it may consider any reason it finds extraordinary and compelling.")

This Court has signaled that it does not agreed with this reasoning. <u>United States v. Barbara Strain</u>, Case No. 3:97-cr-00004-TMB-SAO, Doc. 289 at 8 (D. Alaska April 24, 2020). This Court is not bound by its decision in *Strain*, which relied on a handful of district court cases litigated by *pro se* defendants. None of the cases cited by the Court in *Strain* had occasion to discuss whether the policy statement under U.S.S.G. 1B1.13 remained "applicable" following passage of the First Step Act. *Id.* at 8 (citing *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 12, 2019), *United States v. Johns*, 2019 WL 2646663 (D. Ariz. June 28, 2019) and *United States v. Gross*, 2019 WL 2437463 (E.D. Wash. June 11, 2019).

In *Willingham* and *Lynn,* the courts were not asked to determine whether the U.S.S.G. policy statements remained applicable in light of the First Step Act's modifications. The defendant in *Johns* was granted relief because he satisfied the existing Guidelines criteria, so there was therefore no reason to address exceptions to the policy statement. The order in *Gross* assumed the Gross had to satisfy the policy statement criteria but does not explain why. This is hardly compelling precedent.

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 14 of 27

This Court should follow the majority of district courts and hold that the Court is entitled to assess what constitutes "extraordinary and compelling" grounds for reducing Mr. Ayalacoria's sentence, regardless whether they fall within or outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement.

**C. In the alternative, a reduction in sentence would be consistent with the applicable Guidelines policy statement**.

Alternatively, this Court should find that a reduction in sentence would be consistent with the policy statement and the BOP compassionate release program criteria. Of those courts that have granted compassionate release to defendants based on COVID-19 pandemic, many have held that the policy statement under § 1B1.13 nonetheless remains applicable. These courts have reasoned that a district court is entitled to grant a reduction in sentence under the catch-all provision in Application Note 1(D) which implicitly recognizes that other "compelling reasons" could exist aside from what is listed. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that § 1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, ⎯⎯ F. Supp. 3d ⎯⎯, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach ... [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

And though the BOP's criteria leave it little room to move for a reduction based on COVID-19 vulnerability, a number of courts have also concluded that releasing inmates who are especially vulnerable to coronavirus is consistent with the criteria in U.S.S.G. §

1B1.13. Those orders that weigh COVID-19 vulnerability in the compassionate-release calculus include *Miller v. United States*, 2020 WL 1814084, at \*1,4 (E.D. Mich. Apr. 9, 2020); *United States v. Colvin*, 2020 WL 1613943, at \*3-4 (D. Conn. Apr. 2, 2020); *United States v. Resnick*, 2020 WL 1651508, at \*7 (S.D.N.Y. Apr. 2, 2020); *United States v. Gonzalez*, 2020 WL 1536155, at \*2-3 (E.D. Wash. Mar. 31, 2020); *United States v. Muniz*, 2020 WL 1540325, at \*2 (S.D. Tex. Mar. 30, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020); *United States v. Campagna*, 2020 WL 1489829, at \*1, 2 (S.D.N.Y. Mar. 27, 2020).

### D. COVID-19 is an unprecedented and rapidly-expanding global health emergency that presents a serious risk to vulnerable prisoners.

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[14] COVID-19 is a serious disease that makes certain populations of people severely ill and can lead to death. About 20% of COVID-19 patients require hospitalization, about 10 times more than the percentage of patients with the flu.[15] It estimated to kill at least 10 people per thousand infected, making it ten times more lethal than the seasonal flu. *Id.*[16] On March 26, 2020,

---

[14] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[15] Pien Huang, How The Novel Coronavirus And The Flu Are Alike ... And Different, *www.npr.org* (Mar. 20, 2020) at https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flu-are-alike-and-different.

[16] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

the United States became the global leader in COVID infections.[17]

As of May 11, 2020, COVID-19 has infected over 4 million people worldwide, leading to over 300,000 deaths. *Coronavirus COVID-19 Global Cases*, CENTER FOR SYSTEMS SCIENCE AND ENGINEERING (CSSE) AT JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last visited May 11, 2020) (updating regularly).

The severity of the coronavirus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency.[18] Additionally, more than half of the states and the District of Columbia have imposed severe "lockdown" rules for their citizens.

It is widely agreed that conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[19] As the Centers for Disease Control has stressed, "incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[20] The

---

[17] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, BUSINESS INSIDER (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

[18] *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. Kamran Rahman & Alice Miranda Ollstein, *How States Are Responding to Coronavirus, in 7 Maps*, POLITICO (Mar. 24, 2020), https://www.politico.com/news/2020/03/24/coronavirus-state-response-maps-146144.

[19] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910.

[20] Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23,

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 17 of 27

CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*

On March 21, 2020—approximately two months ago—the BOP announced its first reported inmate case of COVID-19. As of this filing, the BOP has reported 4,664 positive cases of COVID-19 among inmates, and 250 among staff. At least 54 inmates have died, and at least one BOP staff member.

The increase in BOP cases over the past weeks represents a terrifying epidemic curve:

---

2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html



And even these numbers are almost certainly an undercount, because there is almost no testing being conducted at the most seriously affected sites.[21] The president of a correctional officers union estimates inmate infection at 600% of BOP's public number.[22]

---

[21] *See* Eric Heisig, *Judge Grills Federal Prisons Lawyer On Lack of Coronavirus Tests*, Cleveland.com (Apr. 18, 2020) (stating that FCI Elkton, one of the hardest hit facilities, has tested 59 people out of its population of 2000 inmates, and receives only 25 tests per week), available at https://www.cleveland.com/court-justice/2020/04/judge-__grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html; Tom McParland & Jane Wester, *NY Members of Congress Demand Aggressive and Immediate Covid-19 Testing* (Apr. 17, 2020) (reporting that only 19 inmates at MDC and MCC in New York City have been tested, out of population of 2,400, with 10 of those 19 testing positive), available at https://www.law.com/newyorklawjournal/2020/04/17/ny-members-of-congress-demand-aggressive-and-immediate-covid-19-prevention-steps-at-citys-federal-jails/

[22] Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020) (available at: https://bit.ly/2VtyPAv).

One BOP employee told news reporters that "the Bureau is playing with these numbers … if they don't test 'em and they don't get confirmed they don't have to be reported."[23]

It's not that the BOP hasn't taken measures to attempt to control the spread. All inmates have been generally locked down since March 31, 2020, and the BOP has mandated certain cleaning measures and issuance of protective gear. But those measures simply haven't flattened the curve for those inside the institutions' walls. Despite the BOP's efforts, coronavirus continues to spread, putting prisoners, staff, and the communities that surround BOP facilities in greater and greater danger.

1. **The conditions of confinement at federal correctional facilities prevent control of COVID-19.**

The coronavirus responsible for COVID-19 is incredibly infectious. It survives "on surfaces for days."[24] But its real danger is described in a single word: aerosol. Unlike many diseases, "the virus can remain viable and infectious in aerosols for hours"—just breathing will spread the virus, no cough or sneeze required.[25] In a study soon-to-be-published in a Centers for Disease Control journal, researchers confirmed what was already suspected: "SARS-CoV-2 aerosol was detected" in air samples taken in hospital ICUs and general wards up to four meters from infected patients.[26] And that result is echoed by the National

---

[23] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission*,' The Lens (Mar. 31, 2020) (available at: https://bit.ly/34Az7tf).

[24] Mary Van Beusekom, *U.S. studies offer clues to COVID-19 swift spread, severity*, Cntr. for Infectious Disease Research & Policy (Mar. 18, 2020) (available at: https://bit.ly/3b9fk70).

[25] *See id.*

[26] Guo Zhen-Dong, et al., "Aerosol and surface distribution of severe acute respiratory syndrome

Academy of Sciences. In a letter dated April 1st, Dr. Harvey Fineberg, Chair of the National Academy of Medicine's committee on emerging infectious disease, reported that all available studies were showing "aerosolization of [the] virus from normal breathing."[27] He noted how seemingly slight movements can stir up the virus into the air: simply the "doffing of PPE [personal protective equipment], the cleaning of floors, or the movement of staff" may be enough to re-suspend "virus-laden aerosol."[28] Only the 1918 Spanish Flu is thought to be more infectious.[29]

Prison officials cannot reduce breathing, coughing, sneezing, or movement in the cramped, shared spaces of prisons—the phone blocks, the showers, the legal libraries. Just as it spreads easily in the most controlled environments, hospitals, the virus spreads easily in the least prepared, prisons.

Apart from the questionable numbers, BOP fails to consistently follow its own policies. Staff who should be quarantined after exposure aren't.[30] Prisons are failing to stock basic essentials like soap.[31] The situation is so poor that a union representing 30,000

---

coronavirus 2 in hospital wards, Wuhan, China," Emerging Infectious Disease (July 2020) (available at: https://bit.ly/2xqvx98) (peer-reviewed journal published by the Centers for Disease Control). The study found that even in hospitals, the "virus was widely distributed on floors, computer mice, trash cans, and sickbed handrails." Id.

[27] Letter from Dr. Harvey Fineberg, Nat'l Acad. of Med., to Kelvin Droegemeier, Ph.D., Office of the President (Apr. 1, 2020) (available at: https://bit.ly/3b5aUhb).

[28] Id. at 2.

[29] Exhibit D-1 (Beyrer Decl.) at ¶ 10 (each carrier is estimated to infect 3 others on average).

[30] Joseph Neff & Keri Blakinger, Federal Prisons Agency 'Put Staff in Harm's Way' of Coronavirus, The Marshall Project (Apr. 3, 2020) (available at: https://bit.ly/2VkWuTC).

[31] See Letter from Jerrold Nadler, Chair, House Judiciary Comm., to William Barr, Att. Gen., at 1 (Apr. 10, 2020) ("Reports from inside the Oakdale facility indicate that there is a continuing lack of availability of personal hygiene products and that general sanitation is lacking.") (citing Sadie

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 21 of 27

BOP employees has filed an OSHA complaint because "staff who were screened and ordered home" based on the screening tool shown above were "ordered back to work within 48 hours."[32]

Even in BOP's most critical facilities, they are powerless to stop the contagion. Recently, the Government opposed a release motion for an inmate in FCI Butner, citing screening, visitation lockdown, social distancing, and other BOP pandemic policies.[33] On March 24th, Butner had its first reported case. By April 14th, four inmates are dead. Forty-five confirmed infected. Another 25 staff infected.[34]

In short, the virus continues to spread, and despite well-intentioned BOP officials, the agency is ill-equipped to confront one of the most infectious and deadly diseases of the last century.

## 2. Mr. Ayalacoria runs a high risk of serious illness or death if he contracts COVID-19.

The CDC and other medical authorities have clarified that COVID-19 is especially dangerous for both older people and people with severe chronic medical conditions.[35] Eight out ten deaths reported in the United States have been in older adults. *Id.* Those with

---

Gurman et al., *Coronavirus Puts Prison Under Siege*, Wall Street Journal (Apr. 6, 2020) (available at: https://on.wsj.com/3a4TD6K).

[32] *See* Lia Russell, *Union warns of coronavirus exposure in federal prisons, VA facilities*, FCW (Apr. 7, 2020) (available at: https://bit.ly/3a5r3C9).

[33] United States v. Rumley, 08-cr-5 (W.D. Va., April 3, 2020) (ECF No. 185 at 4–7).

[34] Bur. of Prisons, "COVID-19" (available at: https://www.bop.gov/coronavirus/) (last visited: Apr. 14, 2020).

[35] *See* CDC, *Older Adults* (Mar. 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications/older-adults.html.

certain serious health concerns—**including chronic lung disease, moderate to severe asthma, compromised immune systems, severe obesity, diabetes, renal failure, and liver disease**—are also especially vulnerable to and at higher risk for serious complications from COVID-19, including death.[36]

Mr. Ayalacoria states in his *pro se* motion that he suffers from diabetes, hepatitis, high blood pressure and sleep apnea. Each of these conditions places him at an elevated risk of serious injury or death if he contracts COVID-19.

Early research shows that diabetics like Mr. Ayalacoria, have mortality rates that are more than twice as high as overall mortality rates.[37] As one recent report revealed: "Among 784 patients with diabetes, half were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment."[38]

Mr. Ayalacoria's hypertension is also a recognized risk factor for hospitalizations due to COVID-19. In the first large study (over 5,000 patients) of hospitalized COVID-19 patients published in the Journal of the American Medical Association, researchers found

---

[36] *See* CDC, *Information for Healthcare Professionals: COVID-19 and Underlying Conditions* (Mar. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html.

[37] *See* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-chinajoint-mission-on-covid-19-final-report.pdf.

[38] Tom Avril, *How much diabetes, smoking, and other risk factors worsen your coronavirus odds*, Phialdelphia Inquirer (Mar. 31, 2020), https://www.inquirer.com/health/ coronavirus/coronavirusunderlying-conditions-heart-lung-kidney-cdc-20200331.html

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 23 of 27

that among hospitalized patients, 57% suffered from hypertension – the most dominant co-morbidity compared to obesity, or diabetes.[39].

As one district court noted, these statistics, which focus on the non-prison population, become even more concerning when considered in the prison context. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020). This is because prisons are tinderboxes for infectious diseases. The question of whether Mr. Ayalacoria can be protected has been established by the outbreak of COVID-19 infections in the McRae CI facility. At least 19 corrections staff have tested positive, with at least nine inmates infected.

Based on his pre-existing condition alone, Mr. Ayalacoria is among those with the highest risk of death or serious illness from COVID-19. Yet, as an incarcerated person in a facility where the disease is running rampant, it is impossible for Mr. Ayalacoria to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease.

As noted above, the majority of courts to consider the question have deemed the guidelines criteria to be mere "guidance" in determining whether extraordinary and compelling reasons exist. As such, this Court has authority to deem the current situation in

---

[39] JOURNAL OF AMERICAN MEDICAL ASSOCIATION, Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area (April 22, 2020). Available here: https://jamanetwork.com/journals/jama/fullarticle/2765184.

custody, in combination with Mr. Ayalacoria's medical issues, to be an "extraordinary and compelling reason" for his release.

For example, in *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020), the court granted compassionate release to a defendant with diabetes and hypertension, finding those conditions satisfied the guidelines' "serious medical condition" test because they "substantially increase[] her risk of severe illness if she contracts COVID-19." As the court explained, such a defendant "is unable to provide self-care within the environment of [the BOP] in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did develop complications, she would be unable to access her team of doctors" at her regular hospital. Id. (internal quotation marks omitted); *see also United States v. Foster*, No. 1:14-CR-324-JEJ, ECF 191 at 10 (M.D. Pa. Apr. 3, 2020) (finding guideline satisfied where "should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "'not [be] expected to recover'"); *United States v. Perez*, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) ("Confined to a small cell where social distancing is impossible, Perez cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus."); *United States v. Muniz*, 2020 WL 1540325, at *1-2 (S.D. Tex. Mar. 30, 2020) (finding defendant with, *inter alia*, diabetes and hypertension satisfied guideline "[b]ecause Defendant is at high-risk for severe illness from COVID-19 and because inmates in detention facilities are particularly vulnerable to infection").

Taken together, the amount of time Mr. Ayalacoria has already served, combined with his myriad health conditions, along with his particular need to avoid exposure to the current worldwide pandemic convincingly show that "[e]xtraordinary and compelling reasons warrant" a reduction in his sentence. U.S.S.G § 1B1.13(1)(A) & cmt. n.1(B).

3. **Mr. Ayalacoria will not be a danger to the community if he is released, and a sentence of time served constitutes a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

Here, Mr. Ayalacoria has served over ten years' incarceration, with approximately three years left to serve. If his sentence is reduced to time-served, he would be subject to deportation to Mexico. Mr. Ayalacoria has family in Mexico where he can safely shelter in place without undue risk of injury.

Under all of the circumstances in this case, the Court should conclude that the time that Mr. Ayalacoria has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Mr. Ayalacoria for the serious sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a

Case 3:10-cr-00086-TMB   Document 128   Filed 05/27/20   Page 26 of 27

sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions).

The totality of the circumstances demonstrate that reducing Mr. Ayalacoria's sentence to time served after approximately 120 months' incarceration is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).

DATED at Anchorage, Alaska this 27th day of May, 2020.

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Daniel Poulson*
Daniel Poulson
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on May 27, 2020. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Dan Poulson*