BRYAN SCHRODER
United States Attorney

STEPHEN L. CORSO
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: Stephen.Corso@usdoj.gov

Attorneys for the Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>JESUS ALBERTO AYALACORIA, )<br>)<br>Defendant. )<br>_____ ) | No. 3:10-cr-00086-TMB |

## GOVERNMENT'S OPPOSITION TO
## COMPASSIONATE RELEASE (Dkt. 125)

Defendant Ayalacoria has filed a motion asking this Court to reduce his sentence

of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release,

relying in part on the threat posed by the COVID-19 pandemic. The United States

respectfully opposes the motion. This Court should deny the motion without prejudice for

Defendant's failure to exhaust administrative remedies. Although the defendant is

incarcerated in CI McRae, a BOP contract facility, the BOP compassionate release request process is available to him there. Should the Court reach the merits, it should deny the motion with prejudice because Defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

## Factual Background

On November 23, 2010, Ayalacoria pleaded guilty to distributing 50 grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); distributing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possessing a firearm in furtherance of a federal drug trafficking crime, in violation of 18 U.S.C. §924(c)(1)(A)(i). About four months later, under a Rule 11(c)(1)(C) plea agreement, he was sentenced to 180 months (15 years) in prison. He has served around two-thirds of this sentence. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction that would result in his immediate release from BOP custody, relying on the threat posed by the COVID-19 pandemic.

## I.    BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. CI McRae has taken similar measures.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 2 of 22
Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 2 of 22

Movement (Mar. 19, 2020), available at

https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health

Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection

Control (Oct. 2012), available at

https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and

detailed, establishing a multi-phase framework requiring BOP facilities to begin

preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The

plan addresses social distancing, hygienic and cleaning protocols, and the quarantining

and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus

transmissions in January. At that time, the agency established a working group to develop

policies in consultation with subject matter experts in the Centers for Disease Control,

including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its

Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-

19 transmission into and inside its facilities. Since that time, as events require, BOP has

repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The

current modified operations plan requires that all inmates in every BOP institution be

secured in their assigned cells/quarters, in order to stop any spread of the disease. Only

limited group gathering is afforded, with attention to social distancing to the extent

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 3 of 22
        Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 3 of 22

possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page:

www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to

U.S. v. Ayalacoria
3:06-cr-00086-TMB                          Page 5 of 22
Case 3:10-cr-00086-TMB    Document 130    Filed 05/29/20    Page 5 of 22

place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 3,183 inmates to home confinement, which is an increase of 112% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health

U.S. v. Ayalacoria
3:06-cr-00086-TMB                          Page 6 of 22
                Case 3:10-cv-00086-TMB    Document 130    Filed 05/29/20    Page 6 of 22

care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.     Ayalacoria's Conviction and Request for a Sentence Reduction

Between October 2009 and September 2010, Ayalacoria sold methamphetamine and firearms on multiple occasions to confidential sources working under the direction and control of law enforcement. (Dkt. 42.) During a search of his apartment, federal agents seized cocaine, methamphetamine, trafficking paraphernalia and firearms. (Id.) A six-count indictment was returned reflecting these crimes. Under the Rule (c)(1)(C) plea agreement, he was sentenced to 180 months in prison. (Id.)

His PSR reflects that he had a prior history of domestic violence involving his wife, including violating a protective order. (Id.) It also reflects that he had been arrested previously for illegally entering the United States, claiming to be a U.S. citizen. (Id.) In one instance, he was arrested for trying to illegally enter the U.S. one day after being arrested for the same conduct. (Id.) He is a national of Mexico, and an immigration detainer will likely result in deportation to Mexico when he completes his prison term. (Id.)

The Court has denied Ayalacoria's prior attempts to reduce his sentence. In one, the defendant moved under 18 U.S.C. § 3582(c)(2) for a reduction under the "Minus 2"

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 7 of 22
Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 7 of 22

Amendment 782 to the Sentencing Guidelines; the Court denied it because he was sentenced a mandatory minimum sentence. (Dkt. 124.)

He has served around two-thirds to three-quarters of his sentence. In prison, he is being treated for diabetes type 2, hypertension, and asthma. He has not, however, made a request for compassionate release through BOP. BOP will not consider him for home confinement.

On May 7, 2020, Ayalacoria filed a pro se motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that diabetes, asthma, and sleep apnea makes him particularly vulnerable to becoming seriously ill from COVID and that he is more likely to contract COVID in prison than outside of prison. (Dkt. 125.) The Federal Public Defender supplemented this motion on May 27, 2020, raising similar grounds.

## Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 8 of 22
Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 8 of 22

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 9 of 22
Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 9 of 22

solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

## Argument

This Court should deny Defendant's motion for a reduction in his sentence without prejudice because he has failed to exhaust administrative remedies. Should the Court reach the merits of the motion, the Court should deny it because he has not met his burden to show that a reduction is warranted in light of the danger that he would pose to the community and the relevant § 3553(a) factors.

**I.** **This Court Should Deny the Motion Without Prejudice Because Defendant Has Not Exhausted Administrative Remedies.**

This Court lacks authority to act on Defendant's motion for a sentence reduction at this time. As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory, and it continues to serve an important function during the present crisis. The government is very mindful of the concerns created by COVID-19, and BOP is making its best effort both to protect the inmate population and to address the unique circumstances of individual inmates.

Section 3582(c) provides that a court may not modify a term of imprisonment once it has been imposed unless it "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ." § 3582(c)(1)(A). Contrary to Defendant's assertion, the requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. As the Third Circuit recently confirmed, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 11 of 22
Case 3:10-cr-00086-TMB   Document 130   Filed 05/29/20   Page 11 of 22

foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (citing numerous cases). "'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 824 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that presented by the defendant; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and

(iii) where the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for a reduction—are properly viewed as jurisdictional. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[2]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if

---

2 The Fifth Circuit has recognized that the prerequisites for relief under § 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam).

mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that § 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for a sentence reduction where the defendant has failed to satisfy the exhaustion requirement of § 3582(c)(1)(A).[3]

While the government maintains that the time limitation in § 3582(c)(1)(A) is jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts may not revisit a final criminal judgment, the point is ultimately academic. Even if the exhaustion requirement of § 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to

---

3 Although we use the term "exhaustion requirement," to be clear, an inmate need not "exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request by the warden.

U.S. v. Ayalacoria
3:06-cr-00086-TMB          Page 14 of 22

move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule). The government raises the rule here, and it must be enforced.[4]

Defendant nevertheless argues that this Court may ignore the exhaustion requirement in light of the crisis presented by the coronavirus pandemic. That is incorrect. While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in § 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"). Indeed, the Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which it rejected a judicially created "'special circumstances'" exception to a statutory exhaustion requirement. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.

Some have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic. But there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an

---

4 Indeed, even those courts that have concluded that the requirements of § 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under § 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

exception to a statutory exhaustion requirement. Two district courts have recently rejected the argument that any such futility exception exists under § 3582. *See United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). While a few district courts have incorrectly excused the § 3582 exhaustion requirement as futile, two of those decisions have rested on the fact that the defendant had a matter of days left to serve on the sentence, a consideration not present in this case. *See United States v. Colvin*, 2020 WL 1613943, at *1 (D. Conn. Apr. 2, 2020) (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). At least one of those decisions incorrectly relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement. *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).[5] And in any event, a request in this context is not futile, because, as explained further below, BOP

---

5 To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at *2 n.2, that is incorrect. In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000). And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, Defendant's claim for relief in this Court is the same claim he was required to present to BOP. *See also United States v. Demaria*, 2020 WL 1888910, at *3 & n.8 (S.D.N.Y. Apr. 16, 2020) (explaining the *Perez* error at length and the inapplicability of the cases on which it relied).

fully considers requests for sentence reductions. Indeed, BOP often concurs with such requests. During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused.[6] While Congress indisputably acted in

---

6  A handful of courts, mostly in the Second Circuit, have agreed with *Perez* that the exhaustion requirement may be negated. *See also, e.g., United States v. Colvin*, 2020 WL 1613943 (D. Conn. Apr. 2, 2020) (11 days remaining on sentence); *United States v. McCarthy*, 2020 WL 1698732 (D. Conn. Apr. 8, 2020) (26 days remaining on sentence); *United States v. Ben-Yhwh*, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020); *United States v. Zukerman*, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Paciullo*, 2020 WL 1862252, at *2 (S.D.N.Y. Apr. 14, 2020) (court strikes a "compromise" and allows BOP 20 days); *United States v. Russo*, 2020 WL 1862294 (S.D.N.Y. Apr. 14, 2020); *United States v. Smith*, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020).

A number of other district courts in the Second Circuit disagree, while virtually every other district court in the country to consider this issue in a reported decision agrees with *Raia* and the government here that the 30-day requirement must be enforced. *See, e.g., United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020); *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020); *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020); *United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020); *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020); *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020); *United States v. Read-Forbes*, 2020 WL 1888856 (D. Kan. Apr. 16, 2020); *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020); *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020); *United States v. Hofmeister*, 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020) (explaining that the rule is jurisdictional, and perhaps even more necessary during COVID-19 crisis); *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (extensive analysis, concluding, "The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Johnson*, 2020 WL 1663360, at *3-*6 (D. Md. Apr. 3, 2020) (concluding in lengthy discussion that § 3582(c)(1)(A)'s exhaustion requirement is jurisdictional and, regardless, there are no exceptions to the exhaustion requirement); *United States v. Underwood*, 2020 WL 1820092 (D. Md. Apr. 10, 2020); *United States v. Carden*, 2020 WL 1873951 (D. Md. Apr. 15, 2020); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020); *United States v. Mathews*, 2020 WL 1873360 (E.D. Mich. Apr. 15, 2020); *United States v. Annis*, 2020 WL 1812421, at *2 (D. Minn. Apr. 9, 2020) (Tunheim, C.J.) ("There is no question that COVID-19 is a cause for alarm, and the Court does not fault Annis's concerns, given his health conditions. However, given the scale of the COVID-19 pandemic and the complexity of the situation in federal institutions, it is even more important that Annis first attempt to use the BOP's administrative remedies."); *United States v. Gardner*, 2020 WL 1867034 (D. Minn. Mar. 14, 2020); *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020); *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) (lengthy analysis, stating, "In fact, section 3582(c)'s exhaustion proscription is clear as day."); *United States v. Pereyra-Polanco*, 2020 WL 1862639 (S.D.N.Y. Apr. 14, 2020); *United States v. Roberts*, 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020); *United States v. Weiland*, 2020 WL 1674137 (S.D.N.Y. Apr. 6, 2020); *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020) (follows "vast majority" of courts); *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020); *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020); *United States v. Simmons*, 2020 WL 1903281 (D. Or. Apr. 17, 2020); *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020) (very extensive discussion); *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020) (cites numerous cases in agreement); *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020); *United States v. Feiling*, 2020 WL 1821457

the First Step Act to expand the availability of compassionate release, it expressly

imposed on inmates the requirement of initial resort to administrative remedies. And this

is for good reason: BOP conducts an extensive assessment for such requests. *See* 28

C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction

in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g),

*available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures

reflect, the BOP completes a diligent and thorough review, with considerable expertise

concerning both the inmate and the conditions of confinement. Its assessment will always

be of value to the parties and the Court.

That is especially true during the current crisis. As explained above, BOP must

balance a host of considerations in deciding whether to release an inmate to recommend a

reduction in an inmate's sentence or grant the inmate home confinement—not only the

health of the inmate and BOP staff, but also the safety of the public. BOP is best

positioned to determine the proper treatment of the inmate population as a whole, taking

into account both individual considerations in light of on an inmate's background and

medical history and more general considerations regarding the conditions and needs at

particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review

therefore makes sense not only in the ordinary case, but also at this perilous time. As the

---

(E.D. Va. Apr. 10, 2020); *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020); *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020); *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense. The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.").

Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597. *See also United States v. McCann,* 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important.").

The BOP compassionate release request process is available to the defendant at CI McRae. Accordingly, Defendant's motion should be denied without prejudice to refiling once he has exhausted administrative remedies.

## II. Should The Court Reach the Merits, It Should Deny The Motion Because He Poses a Danger to Public Safety.

Defendant's motion for a reduction of his sentence should be denied. Defendant poses a significant danger to the public and the statutory sentencing factors do not weigh in favor of his release.

At the present time, it is apparent that, but for the COVID-19 pandemic, Defendant would present no basis for compassionate release. His medical ailments are well-controlled and do not present any impediment to his ability to provide self-care in the institution.

The only question, then, is whether the risk of COVID-19 changes that assessment. The government acknowledges that Defendant presents a risk factor identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19. The government agrees that this chronic condition presents "a

serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n. 1(A)(ii), in that at this time the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.[7]

However, Defendant is not entitled to relief. This Court must consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. At present, Defendant's medical conditions appropriately managed at the facility, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Defendant would pose a danger to public safety if released. This Court should deny a sentence reduction on that basis alone. Ayalacoria has repeatedly entered, or attempted to enter, the U.S. illegally. While he in the U.S., he trafficked in

---

7  Accordingly, this Court need not consider the suggestion that Defendant's condition falls under the "catch-all" provision of note 1(D), as the government acknowledges that he meets the threshold test of a medical condition defined in note 1(A). This legal issue, regarding whether a Court has authority on its own to identify "extraordinary and compelling circumstances" apart from those described in the guideline policy statement, has recently divided courts in other compassionate release contexts. Given the government's position that Defendant's condition passes the eligibility threshold as defined by the guideline, the issue need not be reached.

U.S. v. Ayalacoria
3:06-cr-00086-TMB                    Page 20 of 22

methamphetamine and cocaine. He also was violent toward his wife. He has little to no respect for U.S. laws. If release and deported, it's likely he would attempt to re-enter the U.S.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Ayalacoria committed serious offenses triggering mandatory minimum sentences. He still has three years or more to serve. Reducing his sentence would not reflect the seriousness of his crimes. It would also undercut its deterrent value.

### Conclusion

For these reasons, this Court should deny the motion. Should the Court grant release, we request that it accommodate the need to quarantine the defendant for a period of at least 14 days in order to protect public health. We request that the Court retain jurisdiction over the motion for 14 days if it makes a determination to grant release, while advising the parties of that decision. The defendant should then be placed in quarantine. If he has not displayed symptoms or tested positive for COVID-19 for a period of 14 days, the Court may then order release. If the defendant tests positive during the initial 14-day period, the government will notify the Court and seek an extension of the release date until the defendant has displayed no symptoms for a period of 14 days or tested negative.

//

//

//

//

RESPECTFULLY SUBMITTED this 29th day of May, 2020, in Anchorage,

Alaska.

BRYAN SCHRODER
United States Attorney

s/ Stephen L Corso
STEPHEN L. CORSO
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2020, a
true and correct copy of the foregoing was
served via electronic mail on the following:

Daniel Poulson
Assistant Federal Public Defender
Daniel_Poulson@fd.org

s/ Stephen L Corso
Assistant United States Attorney